AO 106 (Rev. 04/10)  Application for a Search Warrant

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

APR 05 2019

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

# UNITED STATES DISTRICT COURT
### for the
### Western District of Arkansas

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )        Case No.  19 cm 33
)
FACEBOOK ACCOUNT WITH USER ID )
100012363541611 AND INSTAGRAM ACCOUNT WITH )
USER ID 182023426 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT "A," this court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41

located in the _____ unknown _____ District of _____ unknown _____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and 846; | Distribution of a Controlled Substance and Conspiracy to Distribute and Money |
| 18 U.S.C. 1956 and 1957 | Laundering |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert N. Robinson III, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/5/2019

_____
*Judge's signature*

City and state:  Fayetteville, Arkansas

United States Magistrate Judge Erin Wiedemann
*Printed name and title*

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

APR 0 5 2019

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100012363541611 AND ONE INSTAGRAM USER ID 182023426 ACCOUNTS STORED AT A PREMISES CONTROLLED BY FACEBOOK INC. | Case No. **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Robert N. Robinson III, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with certain Facebook and Instagram user IDs that are stored at a premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

2.     I am a Special Agent (SA) with the Drug Enforcement Administration (DEA), United States Department of Justice. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

1

3.      I, Robert N. Robinson III, am a Special Agent (SA) with the Drug Enforcement Administration ("DEA"), United States Department of Justice, currently assigned to the New Orleans Field Division/Fayetteville Resident Office of DEA, High Intensity Drug Trafficking Area ("HIDTA"). I have been employed as a DEA Special Agent for approximately seven years, having previously worked for twelve years as an officer in the Shreveport Police Department, including seven years as a narcotics detective and two years as a DEA Task Force Officer.

4.      In connection with my official DEA duties, I investigate criminal violations of federal narcotics laws, including but not limited to Title 21, United States Code, Sections 841, 843, 846, and 848; money laundering laws, including Title 18, United States Code, Sections 1956 and 1957; and firearm laws, including Title 18, United States Code, Sections 922 and 924. I have been involved in various types of electronic surveillance, and debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking. I have participated in investigations resulting in the arrest of numerous drug trafficking suspects and in the seizure of substantial quantities of illegal narcotics and proceeds of narcotics sales.

5.      I have participated in investigations involving the interception of wire communications and the use of electronic surveillance. I am familiar with the manner in which narcotics traffickers and money launderers conduct their operations, including but not limited to: their methods of importing and distributing controlled substances, use of telecommunication devices to include cellular telephones, use of counter surveillance techniques, and use of numerical codes and coded and/or cryptic language, words, and references, as well as their use of social networking accounts and messenger capabilities associated with said accounts to conduct their transactions.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841(a)(1) and 846 have been committed by Bryant FORD utilizing the following Facebook user IDs:

- https://www.facebook.com/muney.mitch.90?lst=100022203073602%3A100012363541611%3A1541007364; User ID: 100012363541611; Usernames Yammy Gvng Lito and Easzy Muney Sniper

- https://www.instagram.com/; User ID: 182023426, Username: yammygvnglito

7.     There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

8.     From June 2017 to the present, Agents have been investigating the Bryant Ford Drug Trafficking Organization (DTO). Through Confidential Source (CS) interviews, CS controlled purchases, telephone toll analysis, and both physical and electronic surveillance, Agents have determined that Bryant Ford is the head of the DTO and currently resides in Fayetteville, Arkansas, in the Western District of Arkansas, and the Dallas, Texas area, in the Northern District of Texas. Bryant Ford is originally from Louisiana and utilizes close associates who he trusts in order to distribute large quantities of marijuana in Northwest Arkansas and elsewhere. Agents have identified the following individuals as members of the Ford DTO in Northwest Arkansas:

Jalen Seals, and Quincy Ford.  Agents believe that there are others yet to be identified.  Through CS controlled purchases, physical and electronic surveillance, Agents have determined that large quantities of marijuana are brought to one of Ford's residences located at 2590 E Turtle Creek Drive, Fayetteville, AR 72701, and to storage facilities located in Northwest Arkansas.  These large quantities of marijuana are then reduced to smaller quantities for distribution either by Ford or at the direction of Ford, to local retail dealers.

9.     Agents believe, based on the investigation, that Ford frequently travels to Colorado, California, Oregon and Washington to obtain the marijuana that he distributes in the Western District of Arkansas and elsewhere.  Earlier in the investigation, in October of 2017, a Fed Ex package containing $32,000.00 in U.S. currency was seized in Denver, Colorado after being shipped by Ford in Arkansas. On the same date that the package containing currency was seized, Ford was stopped and arrested in Aurora, Colorado.  At the time of his arrest, Ford was in possession of approximately 45 pounds of marijuana. DEA Denver, Colorado identified Long Phan as a one of Ford's sources of supply for marijuana residing in Colorado. Phan remains under investigation by the DEA Denver Division.

10.     During the course of the drug trafficking investigation into the Ford DTO, Fayetteville DEA, with the assistance of agents with the IRS, have also been conducting a financial investigation into the DTO.  Through the financial investigation, agents have obtained and reviewed financial documents related to Ford and his DTO.   A review of the documents has revealed that over $500,000.00 in illicit funds have funneled through Ford' accounts from April 2015 to present. This amount does not include vehicles and houses owned by members of the Bryant Ford DTO. The majority of the deposits and money wires that have occurred are in cash.

Agents working on this investigation know this activity to be consistent with various marijuana customers depositing drug proceeds (cash) into accounts of the Ford DTO.

11.     In September of 2017, the affiant interviewed a confidential source (hereinafter "CS1") who stated he/she had knowledge of Bryant Ford distributing multi pound quantities of marijuana. CS1 advised that Ford was residing in Fayetteville, Arkansas. In a subsequent meeting with CS1, he/she showed me a "screenshot" of a Facebook profile belonging to Bryant Ford, which at the time was listed as "Easzy Muney Sniper" (Facebook user ID https://www.facebook.com/muney.mitch.90?lst=100022203073602%3A100012363541611%3A 1541007364). The affiant has continued to receive information from CS1 in regards to Ford's use of Facebook and Instagram social media applications. Ford utilizes both Instagram and Facebook to coordinate sales of illegal narcotics. During the course of this investigation, agents have analyzed multiple social media posts on both Facebook and Instagram. These posts depict Ford in possession of large amounts of drug proceeds and assets derived from distribution of illegal narcotics.

12.     On February 6, 2019, the affiant and TFO Blaine Miller met with a separate confidential source, hereafter referred to as CS2, in reference to the drug trafficking activities of Bryant Ford. CS2 advised that he/she met Bryant Ford in 2016 while socializing in nightclubs in Fayetteville, Arkansas. CS2 knows Ford to go by the nickname "Lito." CS2 stated Ford began to communicate with him/her in regards to the distribution of illegal narcotics through social media, specifically "Instagram" and "Facebook." CS2 stated that Ford first asked if CS2 needed marijuana around the end of the year in 2017, approximately in the months of October or November. CS2 stated that he/she would buy a pound of marijuana directly from Ford once a month, or every other month. CS2 stated he/she would pay two thousand dollars per pound of marijuana when he/she

first began to purchase marijuana from Ford. CS2 stated that he/she would always go to Ford's residence at 2590 East Turtle Creek Drive, Fayetteville, Arkansas, to pick up the marijuana. CS2 stated that Ford would usually be alone in the residence when he or she came to pick up marijuana, but if someone was there, they would stay upstairs or in another part of the residence while CS2 was there. CS2 stated that Ford would have a duffel bag full of marijuana in the residence in Fayetteville, Arkansas. CS2 stated the marijuana would be vacuum-sealed in pound amounts with the flavor written on the package. CS2 also stated that Ford would sell him/her "Pens", or THC vape cartridges. CS2 stated he/she always pays Ford in cash. CS2 stated that he/she conducted transactions with Ford at least nine (9) times in the year 2018, which would equal approximately nine (9) pounds. CS2 stated he/she now pays Ford around fifteen hundred per pound depending on quality and bulk prices since he or she has dealt with Ford for several years.

13. CS2 informed agents that Ford has also been living some of the time in Dallas, Texas. CS2 does not know the location of Ford's residence in Dallas, but that he/she believes it is a town house or condominium based on some of Ford's social media posts on "Instagram" and "Facebook."

14. On February 14, 2019, CS2 contacted the affiant and advised that he/she had been in contact with Ford via "Instagram." Agents identified and confirmed Ford's Instagram profile name as "yammygvnglito." CS2 informed agents that Ford utilizes this "Instagram" account to communicate with him/her and other in regards to the distribution of illegal narcotics.

15. On February 14, 2019, in an "Instagram" text message exchange between Ford, who was utilizing the Instagram profile yammygvnglito, and CS2, Ford stated, "I'll have someone in NWA in few days", "Maybe tomorrow." During the same series of text messages, Ford stated, "Bet ima send u the new one I'm getting a new place in Dallas this week." CS2 advised agents

that Ford was informing him/her that he would be ready to distribute marijuana in Northwest Arkansas within the next few days. CS2 also informed investigators that Ford was currently residing in the Dallas, Texas and was apparently moving to a new residence. CS2 informed the affiant that he/she could purchase multiple pound quantities of marijuana from Ford for one thousand three hundred and fifty dollars per pound. However, as previously stated, the price per pound fluctuates depending on quality and amount available.

16. On February 15, 2019, beginning at approximately 2:50 p.m., CS2 sent Ford several outgoing text messages via Ford's cellular phone number (318) 439-3092 here and after referred to as Target Telephone 1. One of CS2's text messages stated, "Tried hitting you on IG but I bet you get flooded on there lol." CS2 advised "IG" was an abbreviation for Instagram. One of CS2's outgoing text messages informed Ford that he/she would be in the Fayetteville area in the next hour or so. On the same date, CS2 received an incoming text message from Ford on Target Telephone 1, stating, "Ok" "How many u needed." Agents working on the investigation know that in this exchange, Ford was asking CS2 how many pounds of marijuana did CS2 need. CS2 replied to Ford on Target Telephone 1 that "2 today forsure I may need more this week too, me and Anna live together and she don't like it at home unless it's personal." CS2 also stated, "You gonna have pens soon? That's the only thing I like and it helps me sleep." Ford replied, "Ya I'll have more soon." CS2 replied, "Bet that. What flavors you got right now." CS2 also asked Ford if he want the CS2 to come to his residence in an additional text message. Ford replied, "Ima let u know soon he hit me prolly next hr." CS2 replied, "Word, before 530 if possible." Ford replied, "Ok."

17. Then, at approximately 4:14 p.m., CS2 received an incoming text message from Ford using Target Telephone 1, stating, "Wat up." CS2 replied to Ford letting Ford know he/she had just gotten some food to eat. Ford replied, "Ok he ready." CS2 replied, "Where do I need to head?"

Ford replied, "My place." CS2 replied, "Omw." Ford stated, "Ok", "How far u?" CS2 informed

Ford of his/her location. At approximately 4:30 p.m., TFO Dustin Johnson conducted surveillance

of 2590 E. Turtle Creek Drive, Fayetteville, Arkansas. TFO Johnson video recorded a subject

identified as Quincy Ford in the driveway of the residence standing next to a white 2012 Dodge

Charger bearing state of Arkansas plate #585VSS (registered to: Tiffany Wright, Address: 2108 N

East Oaks Drive Apt 12, Fayetteville, Arkansas). At approximately 4:35 p.m., CS2 met with the

affiant and TFO Blaine Miller at a predetermined location. TFO Miller and the affiant searched

CS2 and CS2's vehicle for illegal narcotics and contraband with negative results. The affiant

photographed the phone number that CS2 advised he/she was receiving the text messages from

that are described in this paragraph. The phone number was Target Telephone 1 and CS2 had the

number stored under the contact name "Leto." This number and aka is known by the affiant and

CS2 as both the phone number and nickname of Bryant Ford. Agents equipped CS2 with

an electronic audio/video recording device and supplied CS2 with twenty seven hundred dollars

of previously photocopied DEA Official Advance Funds (OAF). Plans were formulated for CS2

to travel to Bryant Ford's residence located at 2590 East Turtle Creek Drive, Fayetteville, Arkansas

in reference to CS2 purchasing two pounds of marijuana from Bryant Ford or a member of his

DTO.

18.    On this date, CS2 went to Bryant Ford's residence in Fayetteville, Arkansas and

knocked on the front door. A subject identified as Quincy Ford aka "Tip" opened the front door

and allowed CS2 to enter the residence. CS2 greeted Quincy Ford by stating, "What's up bro? How

you doing?" Quincy Ford replied, "Good." Upon entering the residence CS2 made contact with at

least three male subjects in the living room area, Bryant Ford was one of these subjects. CS2 and

Bryant Ford engaged in a drug related conversation. Bryant Ford told CS2 the different types of

marijuana that he had for distribution. CS2 confirmed during the conversation that the price per pound of marijuana was one thousand three hundred and fifty dollars. CS2 supplied Bryant Ford with the twenty seven hundred dollars in DEA OAF in exchange for two pounds of marijuana that was later marked Exhibit 30. During the conversation Bryant Ford stated, "Yeah, this shit be gone, bro, that's why I be trying to tell you, bro, when I come re-up, I re-up, but this shit leaves, bro, in like three days, this shit ain't here." Ford stated, "Three days and this shit is gone." CS2 informed Bryant Ford which packages of marijuana he/she liked best. Ford replied, "Which one? Ohh…yes…that shit is good, but it don't smoke the best, though…" Ford also stated, "I can't remember, Bro, I don't remember the names on none of them motherfuckers." Agents believe, based on the investigation and the context of this meeting and conversation that Ford is referring to the different names for the various types of marijuana. CS2 asked Ford about a specific package and Ford stated, "Yeah!, because it's purple,  like…they go quick, the purple ones go quick, especially in Fayetteville, anyway." CS2 stated during the conversation, "Oh, let me know your address when you get it, when you moving in Dallas?" Ford replied, "Oh, over by, I already got an apartment downtown."

19.     CS2 departed from the location. The affiant followed CS2 to a predetermined location. The affiant took possession of the audio/video recording device from CS2. CS2 relinquished custody of Exhibit 30 to the affiant. CS2 informed agents that he/she gave Bryant Ford the twenty seven hundred dollars in Official Funds in exchange for Exhibit 30.   CS2 and CS2's vehicle were again searched for illegal narcotics and contraband with negative results. CS2 informed agents that he/she observed approximately one hundred pounds of marijuana inside the residence in Fayetteville, Arkansas where the transaction had just occurred. CS2 stated that the marijuana appeared to be packaged in one-pound increments and were in three separate large

duffel bags. Exhibit 30 was processed into DEA Evidence at the DEA Fayetteville Resident Office. Exhibit 30 field tested positive as marijuana by the affiant. Exhibit 30 was mailed to the DEA Southeast Laboratory for further testing and safekeeping.

20.    The following post is a post from Ford's Instagram account. This is a message exchange using Instagram messenger between CS2 and Ford on February 14, 2019, in reference to the purchase of Exhibit 30 on February 15, 2019. Agents interpret this thread as Ford letting the CS know that he is currently distributing one pound of marijuana for one thousand three hundred and fifty dollars.



21.   CS2 has confirmed that CS2 and Bryant Ford are friends on both Facebook and Instagram. CS2 and Bryant Ford communicate through both social media applications. I believe that Ford utilizes his Facebook and Instagram user IDs to communicate with other members of his drug trafficking organization to arrange drug shipments and discuss laundering drug proceeds. I believe those communications may be stored on Bryant Ford's Facebook and Instagram user IDs, thus I am requesting authorization to search Facebook and Instagram user IDs utilized by Bryant Ford. I also believe that Bryant Ford may continue to utilize Facebook and Instagram to discuss additional and future drug transactions or money laundering transactions between customers, and or other DTO members.

22.   Ford recently made this post on Facebook, "I Give Every Nigga Around Me A Chance to Get Money If U See Me Stop Fucking With Them Cuz They Ain't Bout Money. I Put People In Position To Get Bread N Provide For They Family Some U Nigga Ain't Built To Have Ur Own Empire."   Based on the investigation up to this point and based on my training and experience, I believe that Ford is referring to members of his drug trafficking organization not distributing enough illegal narcotics for the organization, and that when Ford refers to "Bread" he is referring to drug proceeds (and the fact that subjects are not generating the amount of proceeds that they could distributing illegal narcotics).



23.   Ford recently posted the following on his Instagram timeline.  The post is Ford in possession of a large amount of United States Currency.  Agents believe based on the investigation up to this point that the money in this post was derived from the illegal distribution of marijuana. Ford does not have a legitimate source of income.  Ford does not work outside of his drug trafficking activities.



24. Ford recently posted the following post on his Instagram timeline. The post is of a BMW i8 that Ford recently purchased with what the affiant believes to be drug proceeds, based on the investigation. The purchase of the BMW i8 occurred following CS2's purchase of Exhibit 30

on February 15, 2019. Ford informed CS2 during the purchase that he was planning to purchase

the BMW i8.



25. The affiant submitted a request to Facebook preserving all information on Ford's Facebook and Instagram user IDs on February 12, 2019, because I believe based on the investigation up to this point, that Ford utilizes these accounts to facilitate his drug trafficking activities and to discuss these activities. Furthermore, I believe, based on what is detailed in the above paragraphs, that evidence is stored on the Facebook and Instagram user IDs belonging to Ford. Facebook, however, will not release the information for use in the investigation and prosecution of this case without a search warrant.

26. Based on the investigation up to this point, I believe that Ford is the user of Facebook user IDs, https://www.facebook.com/profile.php?id=100012363541611, I also believe that based on the intercepted communications between Ford and CS2, private messages discussing drug transactions and/or money laundering transactions may be stored on Ford's Facebook user IDs. Furthermore, I believe there are conversations, pictures, videos, and/or private messages stored on Ford's Facebook user IDs that prove a relationship between Ford, and members of the Ford DTO.

27. Based on the foregoing, I believe that Ford is the user of Instagram user IDs, https://www.Instagram.com/ID:182023426, I also believe that based on the intercepted communications between Ford and CS2, private messages discussing drug transactions and/or money laundering transactions may be stored on Ford's Instagram user IDs. Furthermore, I believe there are conversations, pictures, videos, and/or private messages stored on Ford's Instagram user IDs that prove a relationship between Ford, and members of the Ford DTO.

### USES OF FACEBOOK AND INSTAGRAM

28. Facebook owns and operates a free-access social networking website of the same name that can be accessed at https://www.facebook.com to also include ownership of Instagram, which can be accessed at https://www.instagram.com. Hereafter when referring to Facebook, it

should be known that it is referring to both free-social networking websites, Facebook and Instagram, owned by Facebook Inc.  Facebook allows its users to establish free-social networking accounts, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

29.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

30.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

34.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own

profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

35. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

40. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized

message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

41.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

42.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

44.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Lastly, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense

under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook and Instagram, both owned by Facebook Inc., to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

48.     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Robert N. Robinson III
Special Agent, Drug Enforcement Administration

Subscribed and sworn to before me on the 5ᵗʰ day of April, 2019.

Erin Wiedemann
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100012363541611 and Instagram user ID 182023426 that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

- https://www.facebook.com/muney.mitch.90?lst=100022203073602%3A100012363541611%3A1541007364; User ID: 100012363541611; Usernames: Yammy Gvng Lito and Easzy Muney Sniper

- https://www.instagram.com/; User ID: 182023426, Username: yammygvnglito

Page 24 of 27

## ATTACHMENT B

### Particular Things to be Seized

**I.   Information to be disclosed by Facebook Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages  (including, but not limited to, messages sent or received through Facebook Messenger and Instagram), records, files, logs, or information that have been deleted but are still available to Facebook Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook Inc. is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook and Instagram passwords, security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook and Instagram activities;

(c)   All photos and videos uploaded by that user ID;

(d)   All profile information; news feed information; status updates; links to videos, photographs, articles, and other items; notes; wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook and Instagram group identification numbers; future and past event postings; rejected "Friend" requests;

comments; and information about the user's access and use of Facebook and Instagram applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All IP logs, including all records of the IP addresses that logged into the accounts;

(g) All past and present lists of friends created by the accounts;

(h) All records of Facebook and Instagram searches performed by the account;

(i) The types of service utilized by the user;

(j) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(k) All privacy settings and other account settings, including privacy settings for individual Facebook and Instagram posts and activities, and all records showing which Facebook and Instagram users have been blocked by the account; and

(l) All records pertaining to communications between Facebook, Instagram and any person regarding the user or the user's Facebook and Instagram account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

(a) All information described above in Section I that constitutes fruits, evidence, and/or instrumentalities of violations of  21 U.S.C. §§ 841(a)(1) and 846 involving the individuals utilizing Facebook  and Instagram user IDs:

- https://www.facebook.com/muney.mitch.90?lst=100022203073602%3A1 00012363541611%3A1541007364; User ID: 100012363541611; Usernames: Yammy Gvng Lito and Easzy Muney Sniper

- https://www.instagram.com/; User ID: 182023426, Username: yammygvnglito

including pictures, videos, posts, and messages (including, but not limited to, messages sent or received through Facebook Messenger and Instagram).

(b)   Evidence indicating how and when the Facebook and Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook and Instagram account owner; and

(c)   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## III.   Means of Production

(a)   Facebook, Inc., to include Facebook and Instagram, shall disclose responsive data, if any, by sending to the Drug Enforcement Administration, C/O: Special Agent Robert N. Robinson III, at 179 East Colt Drive, Fayetteville, Arkansas 72703 via U.S. Postal Service or another courier service, notwithstanding Title 18 U.S.C. 2252A or similar statute or code.   Facebook, Incorporated must provide a CERTIFICATION OF AUTHENTICITY with any and all records and information recovered pursuant to this search warrant.